# Supreme Court of Florida

---

No. SC2024-0944

---

**JERMAINE FOSTER,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

July 16, 2026

PER CURIAM.

Jermaine Foster appeals the circuit court's order denying his amended successive motion for postconviction relief under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.; *see also State v. Fourth Dist. Ct. of Appeal*, 697 So. 2d 70, 71 (Fla. 1997) (holding "that in addition to our appellate jurisdiction over sentences of death, we have exclusive jurisdiction to review all types of collateral proceedings in death penalty cases"). For the reasons below, we affirm.

## I

In 1994, Jermaine Foster was convicted of two counts of first-degree murder, one count of attempted first-degree murder, and four counts of kidnapping. *Foster v. State*, 679 So. 2d 747, 751 (Fla. 1996). The crimes were carried out in 1992 by a group of four codefendants: Foster, Leondra Henderson, Gerard Booker, and Alf Catholic. The group committed robberies to recoup Booker's recent gambling losses. Importantly, "Foster told Henderson, Booker, and Catholic that if the victims did not have any money, he was going to kill them." *Id.* at 750.

Foster and the codefendants followed a car carrying four people: Anthony Faiella, Michael Rentas, Anthony Clifton, and Tammy George. Catholic, who was driving the codefendants' truck, rammed the back of the victims' car to get it to stop. When the victims got out of their car, the codefendants took out weapons and demanded money. After the victims stated they did not have any money, the victims were forced to return to their car. Booker drove the victims' car and Henderson held the victims at gunpoint from the passenger seat. Foster and Catholic followed in their truck. When the truck began experiencing mechanical problems, the

codefendants turned off the main highway into a vacant field. The codefendants forced the victims out of the car and demanded money again. After the victims repeated that they did not have money, Foster shot Faiella, Rentas, and Clifton (Clifton and Faiella were killed, but Rentas survived). George was not shot.

All four codefendants were apprehended within days. The State obtained statements from Rentas and George before the codefendants were arrested. Rentas gave another statement describing the crime on December 8, 1992. Henderson gave a statement to law enforcement after being arrested on December 1, 1992. Henderson gave another statement on December 7, 1992. Henderson proffered his testimony with the State for a possible plea agreement on January 11, 1993.

Foster was first tried in federal court on charges from this crime spree. *Id.* at 751. He "was there convicted of conspiracy to commit armed carjacking, armed carjacking resulting in deaths, armed carjacking, and two counts of use of and carrying firearms during and in relation to a violent crime." *Id.* A state grand jury thereafter "indicted Foster on two counts of first-degree murder, one count of attempted first-degree murder, and four counts of

- 3 -

kidnapping." *Id.* A jury convicted Foster of all counts. *Id.* After a penalty phase hearing, the jury unanimously recommended sentencing Foster to death for the two murders. *Id.*[1] The court sentenced Foster to death. *Id.* And this Court affirmed Foster's convictions and sentences on direct appeal in 1996. *Id.* at 756.

In 1998, Foster filed an initial motion for postconviction relief. *Foster v. State*, 929 So. 2d 524, 527 (Fla. 2006). Following an evidentiary hearing that included testimony on Foster's mental state, but before the postconviction court ruled on the motion, the United States Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002). Foster added a claim under *Atkins*. *Foster*, 929 So. 2d

---

1. The court found four statutory aggravators and one statutory mitigator. The aggravating factors included that

> Foster was previously convicted of another capital felony; the capital felony was committed while the defendant was engaged in the commission of a kidnapping; the capital felony was committed for pecuniary gain; and the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.

*Foster*, 679 So. 2d at 751 n.2 (citing § 921.141(5)(b), (d), (f), (i), Fla. Stat. (1993)). In mitigation, "[t]he trial court found that Foster's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired." *Id.* at 751 n.3 (citing § 921.141(6)(f), Fla. Stat. (1993)).

- 4 -

at 531.  The postconviction court denied the motion.  *Id.* at 528.
After oral argument, this Court relinquished jurisdiction to the
postconviction court for an evidentiary hearing.  *Id.*  The
postconviction court again denied relief.  *Id.*  The postconviction
court also reviewed the *Atkins* claim and found that the evidence
did not support the claim.  *Id.* at 532-33.  We affirmed on appeal in
all respects.  *Id.* at 537.

In August 2017, Foster filed his first successive motion for
postconviction relief raising an intellectual disability claim based on
*Hall v. Florida*, 572 U.S. 701 (2014), and claims based on *Hurst v.
Florida*, 577 U.S. 92 (2016), and *Hurst v. State*, 202 So. 3d 40 (Fla.
2016).  *Foster v. State*, 260 So. 3d 174, 178 (Fla. 2018).  The
postconviction court summarily denied the motion.  *Id.*  But we
reversed and remanded for an evidentiary hearing on the *Hall*
intellectual disability claim and affirmed the summary denial of the
other two claims.  *Id.* at 181.

Before the *Hall* hearing, Foster filed his second successive rule
3.851 motion in 2018 raising claims based on *Brady v. Maryland*,
373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150
(1972), both of which were largely based on Foster's claim that

Henderson's testimony was coerced and false. The motion alleged that Henderson had recanted his statement about Foster planning to kill someone ahead of time. Foster also pursued a claim based on *Hurst*, 577 U.S. 92.[2] The postconviction court granted an evidentiary hearing on Foster's *Brady* and *Giglio* claims, held in conjunction with the *Hall* hearing.

Foster amended his second successive motion for postconviction relief on September 14, 2021. After this Court's decision in *Thompson v. State*, 341 So. 3d 303 (Fla. 2022), the State again moved for cancellation of the *Hall*-compliant hearing. *Foster*, 395 So. 3d at 129. The postconviction court granted the renewed motion for summary denial and denied Foster's intellectual

---

2. Also before the *Hall* hearing took place, this Court decided *Phillips v. State*, 299 So. 3d 1013 (Fla. 2020), where it held that *Hall* should not be given retroactive application. *Foster v. State*, 395 So. 3d 127, 129 (Fla. 2024). Relying on *Phillips*, the State moved to cancel the *Hall* hearing in Foster's case and dismiss the intellectual disability claim. *Id.* However, at the hearing on the State's motion, the State conceded that based on the intervening decision in *State v. Okafor*, 306 So. 3d 930 (Fla. 2020), the postconviction court could not deviate from the mandate requiring an evidentiary hearing in Foster's case. *Foster*, 395 So. 3d at 129. Accepting the State's concession, the postconviction court denied the motion for summary denial of Foster's intellectual disability claim. *Id.*

disability claim, finding that *Phillips* constituted an intervening change in controlling caselaw, *Hall* did not apply retroactively, and the State's concession as to the application of *Okafor* did not constitute a waiver of the argument that *Hall* is not retroactive. *Id.* We affirmed on appeal. *Id.* at 131.

In March 2023, the postconviction court held a *Huff*[3] hearing on the amended successive motion for postconviction relief. In May 2023, the postconviction court granted an evidentiary hearing on Foster's *Brady* and *Giglio* claims but denied two other claims.[4]

In November 2023, Foster filed an amendment to his successive motion for postconviction relief, or in the alternative, a third successive rule 3.851 motion. The court held an evidentiary hearing on December 11 and 12, 2023, with Foster presenting fourteen witnesses. The State did not call any witnesses.

Because Henderson's testimony about Foster's intent was key to his conviction and the cold, calculated, and premeditated

---

3. *Huff v. State*, 622 So. 2d 982 (Fla. 1993).

4. The circuit court summarily denied the other grounds in Foster's motion, which he does not challenge on appeal.

aggravator, much of the evidentiary hearing focused on whether Henderson's testimony at the time of Foster's trial was coerced and false. In support, Foster presented testimony from several other individuals who said they spoke to Henderson post-trial. Jeffrey Ashton, the prosecutor at the time, also testified, during which Foster's counsel moved to admit into evidence a letter to Ashton from Mark O'Mara, counsel for codefendant Booker. The letter concerned a polygraph test that Booker had taken. The State objected on the basis of hearsay within hearsay and that polygraph results were inadmissible as a matter of law. Foster's counsel responded that the letter went to Ashton's knowledge of what information was available when he offered Henderson a plea agreement. The court overruled the State's objection and admitted the letter into evidence. Foster's counsel then moved to admit the polygraph report into evidence. The State objected based on hearsay and inadmissibility. The court sustained the State's objection and did not admit the polygraph report. Foster's counsel proffered the report for the record, also seeking clarification of the decision not to admit. The court responded that "[i]t's the contents."

On April 2, 2024, the postconviction court entered an Amended Final Order Denying Defendant's Amended Successive Motion for Postconviction Relief. In doing so, the court found that based on the totality of the circumstances, Foster failed to show that Henderson was coerced into testifying falsely. Acknowledging the inconsistencies in Henderson's statements, the court still concluded that "Henderson's statement regarding [Foster's] premeditation is credible." The court also concluded that Foster failed to show that the State suppressed exculpatory evidence and that the State knew or should have known that Henderson's testimony was false. Foster moved for rehearing and the court denied Foster's motion on May 1, 2024. Foster timely filed his notice of appeal on May 30, 2024.

## II

In his first and second arguments on appeal, Foster argues the postconviction court erred in denying his claim that the State knowingly presented and/or failed to correct Henderson's false testimony in violation of *Giglio* and his *Brady* claim that was predicated on Henderson's allegedly coerced testimony. We address these claims together because, in our view, resolution of both issues

turns on whether the postconviction court's credibility determinations were supported by competent, substantial evidence.

We apply a mixed standard of review to both claims, reviewing factual findings for competent, substantial evidence and legal conclusions de novo. *Sheppard v. State*, 338 So. 3d 803, 827-28 (Fla. 2022) (citing *Duckett v. State*, 231 So. 3d 393, 400 (Fla. 2017)); *see also Sochor v. State*, 883 So. 2d 766, 785 (Fla. 2004). "Evidence is competent if it is 'sufficiently relevant and material'; evidence is substantial if there is enough that 'a reasonable mind would accept [the evidence] as adequate to support a conclusion.'" *Gordon v. State*, 350 So. 3d 25, 35 (Fla. 2022) (alteration in original) (quoting *De Groot v. Sheffield*, 95 So. 2d 912, 916 (Fla. 1957)).

To prevail on a *Brady* violation, a defendant must show that "(1) the evidence was either exculpatory or impeaching; (2) the evidence was willfully or inadvertently suppressed by the State; and (3) because the evidence was material, the defendant was prejudiced." *Sheppard*, 338 So. 3d at 827 (quoting *Duckett*, 231 So. 3d at 400). For a *Giglio* violation, a defendant must show that "(1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material." *Id.*

(quoting *Duckett*, 231 So. 3d at 400). "Unlike a *Brady* claim for which the defendant bears the burden of proof as to the materiality prong, '[u]nder *Giglio*, once a defendant has established that the prosecutor knowingly presented false testimony at trial, the state bears the burden to show that the false evidence was not material.'" *Id.* (alteration in original) (quoting *Guzman v. State*, 868 So. 2d 498, 507 (Fla. 2003)).

In denying Foster's claims, the postconviction court focused primarily on the first prongs of the *Brady* and *Giglio* tests, concluding that Henderson's testimony was not false and likewise not coerced. In doing so, the postconviction court was tasked with wading through conflicting testimony. For example, Henderson confirmed that there was threatening conduct by the state officers at the proffer. Even so, he explained that he was not pushed to make the statement about Foster's intent. Elaine Henderson, Henderson's mother, also affirmed that there was yelling and cursing during the proffer. But Ashton testified that there was nothing improper about the way the interviewers acted.

Foster called a significant number of witnesses who testified that Henderson told them that his testimony was coerced.

However, Henderson denied speaking to some of these witnesses, and he also claimed that he made up the story about being coerced as part of a plan to help Foster. The additional evidence submitted also conflicted with some of the testimony. For example, the calls between Henderson and his mother show that they discussed threatening conduct at the proffer, and Henderson testified that his mother did not pressure him to change his testimony to help Foster. At the end of the day though, Henderson stood by his testimony about Foster's intent to kill the victims.

Despite the conflicting testimony, there is competent, substantial evidence to support the circuit court's conclusion that Foster failed to demonstrate Henderson was coerced into testifying falsely. Ashton admitted that they did have to "push" Henderson to get him to admit to his level of culpability; however, Ashton was adamant that no one told Henderson what he was expected to say and that the only threat involved was "the natural threat of prosecution and eventual sentence." Ashton also made clear that he would not have put Henderson on the witness stand had he not believed his testimony to be truthful in all the material, important aspects. Likewise, Henderson testified that the yelling was directed

at his own involvement in the crime, not his testimony about Foster. In addition, Henderson's attorneys were with him during the proffer.

Foster's arguments to the contrary invite this Court to reweigh the evidence. He argues, in part, that Henderson "never clarified why anyone would be calling him telling him to change his testimony." Foster also characterizes Henderson's testimony as "incredible." But Foster cites no legal basis to conclude that the testimony was insufficient to sustain the postconviction court's determination or that Henderson's testimony was incredible as a matter of law. So resolving any perceived gaps in Henderson's testimony was part of the postconviction court's credibility determination—a determination to which we defer given its record support. *See Mosley v. State*, 209 So. 3d 1248, 1263 (Fla. 2016) ("This Court is highly deferential to the postconviction court's factual findings and 'will not substitute its judgment for that of the trial court on . . . the credibility of the witnesses and the weight to be given to the evidence.' " (omission in original) (quoting *Wyatt v. State*, 71 So. 3d 86, 105 (Fla. 2011))); *Martin v. State*, 311 So. 3d 778, 810 (Fla. 2020) ("[W]e defer to findings of credibility by the

factfinder where they are supported by competent substantial evidence." (citing *Moore v. State*, 132 So. 3d 718, 726 (Fla. 2013))). We will not substitute our judgment "for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court." *Hayward v. State*, 183 So. 3d 286, 311 (Fla. 2015) (quoting *Lowe v. State*, 2 So. 3d 21, 30 (Fla. 2008)).

Foster has not established that the postconviction court erred in its credibility determination regarding Henderson's testimony and its ultimate conclusion that it was not coerced. As a result, Foster cannot demonstrate error in the postconviction court's rejection of his *Brady* and *Giglio* claims.[5]

### III

Finally, Foster argues the postconviction court violated his due process rights when it sustained the State's objection to the admissibility of a polygraph report. Although Foster frames this issue as a due process violation, it is in essence an appeal of a

---

6. Because we conclude the postconviction court did not err in its credibility determination, we need not address Foster's remaining arguments related to these claims.

ruling on the admission of evidence, which we review for an abuse of discretion. *Baker v. State*, 71 So. 3d 802, 816 (Fla. 2011) (citing *Frances v. State*, 970 So. 2d 806, 813 (Fla. 2007)). "In order to preserve a claim based on the court's refusal to admit evidence, the party seeking to admit the evidence must proffer the contents of the excluded evidence to the trial court." *Id.* (quoting *Blackwood v. State*, 777 So. 2d 399, 410 (Fla. 2000)). "The admission of evidence is within the sound discretion of the trial court, constrained by the application of the rules of evidence and the principles of stare decisis." *Hayward*, 183 So. 3d at 325 (citing *Davis v. State*, 121 So. 3d 462, 481 (Fla. 2013)).

"This Court has repeatedly explained that polygraph evidence is generally inadmissible in Florida." *Serrano v. State*, 225 So. 3d 737, 758 (Fla. 2017) (first citing *Duest v. State*, 12 So. 3d 734, 746 (Fla. 2009); and then citing *Walsh v. State*, 418 So. 2d 1000, 1002 (Fla. 1982)). Still, Foster argues that the admissibility of the polygraph report should have been assessed against the backdrop of the *Brady* and *Giglio* claims as it was offered to demonstrate the State's knowledge of Henderson's falsities, not to prove guilt or innocence. *See, e.g., Rogers v. State*, 782 So. 2d 373, 383 n.11 (Fla.

2001) ("While the actual police reports may not be admitted as substantive evidence, they can still serve as the basis for Rogers' *Brady* claim to the extent he could have investigated and used the information contained in the reports.").

Foster's reliance on *Rogers* is misplaced. Foster does not allege that the State withheld the polygraph report, nor does he claim it was material under *Brady*. Instead, Foster sought to admit the report to undermine Henderson's credibility and to demonstrate knowledge by Ashton. Given that "[t]he rule that polygraph evidence is inadmissible is well established in Florida," *Delap v. State*, 440 So. 2d 1242, 1247 (first citing *Zeigler v. State*, 402 So. 2d 365 (Fla. 1981); then *Sullivan v. State*, 303 So. 2d 632 (Fla. 1974); and then *Kaminski v. State*, 63 So. 2d 339 (Fla. 1952)), the circuit court did not abuse its discretion by refusing to admit the polygraph report. *See also State v. Santiago*, 679 So. 2d 861, 863 (Fla. 4th DCA 1996) (quashing trial court's admission of a polygraph test and certifying question to this Court).

Even if it was error to exclude the report, it was harmless. At the time the postconviction court refused to admit the report, it had already admitted Mark O'Mara's letter to Ashton over the State's

objection. O'Mara's letter explained that the polygraph report showed that Henderson was more culpable in the crime. The letter stated that "Mr. Booker contends that it was in fact Leondra Henderson who intended on killing Tammy George just after the shooting of Mr. Clifton, Mr. Rentas and Mr. Faiella." The letter also added that "it was Mr. Henderson's idea to rob the victims and take their Pathfinder." Because much of what the polygraph report would have demonstrated was accounted for in O'Mara's letter, we conclude any error did not contribute to the postconviction court's decision.

IV

We affirm the postconviction court's denial of Foster's motion for postconviction relief.

It is so ordered.

COURIEL, C.J., and LABARGA, MUÑIZ, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
TANENBAUM, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Orange County,
    Jalal A. Harb, Judge
    Case No. 481993CF012001000AOX

Linda McDermott and Lauren Rolfe, Office of the Federal Public Defender, Northern District of Florida, Tallahassee, Florida; and Eric Pinkard, Capital Collateral Regional Counsel, and Julissa R. Fontán, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

    for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, and Doris Meacham, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee